1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   Sara Roeder,                          No. 1:21-cv-01115-KJM-SAB

12                    Plaintiff,           ORDER

13          v.

14   Kautz Vineyards, Inc., et al.,

15                    Defendants.

16

17          Sarah Roeder brings this action against Kautz Vineyards, Inc., over the termination of her

18   employment at Ironstone Vineyards during the COVID-19 pandemic.  Roeder alleges Kautz

19   interfered with her Families First Coronavirus Response Act (FFCRA)/Emergency Family and

20   Medical Leave Expansion Act (EFMLEA) rights when it fired her.  She also alleges she

21   experienced sexual discrimination and harassment while employed at Kautz and Kautz terminated

22   her employment in violation of public policy.

23          Kautz moves for summary judgment or, in the alternative summary adjudication, on all of

24   Roeder's allegations and asks the court to deny Roeder's prayer for punitive damages.  The court

25   **grants** the motion in part and **denies** in part, as explained below.

26   /////

27   /////

28   /////

1

1    **I.    BACKGROUND**

2          Roeder began working at Ironstone Vineyards in June 2019.  Kautz Decl. ¶ 3, ECF No.

3    13-4; Henderson Decl. Ex. A (Def.'s Roeder Dep.) at 11–12, ECF No. 13-3.[1]  By August, Kautz

4    promoted her to tasting room manager.  Kautz Decl. ¶ 3.  In March 2020, Ironstone closed its

5    tasting room to the public due to the COVID-19 pandemic and furloughed Roeder and other

6    employees.  *Id.* ¶ 6; McLaughlin Decl. ¶ 7, ECF No. 13-5.

7          Possibly on April 20, 2020—Roeder does not remember the date, *see* Asbill-Bearor Decl.

8    Ex. A (Pl.'s Roeder Dep.) at 6:18–8:8, ECF No. 17-3,—Roeder met with Stephen Kautz, the

9    president of the vineyard and Karen McLaughlin, the human resources manager at the vineyard.

10   Kautz Decl.¶ 7; McLaughlin Decl. ¶ 8.  Kautz and McLaughlin asked Roeder about her

11   availability for returning to work at Ironstone.  *See* Kautz Decl. ¶ 7.  Roeder, who had children

12   aged 9 and 11 at the time, told McLaughlin and Kautz she was only available on nights and

13   weekends because she had to supervise her children who were attending school at home over

14   Zoom.  Pl.'s Roeder Dep. at 8:5–15.  She made a request to McLaughlin to provide information

15   on possible leave options.  McLaughlin Decl. ¶ 8.  The following day, McLaughlin sent Roeder a

16   follow-up email with attachments on leave options if Roeder could not return to work during

17   Ironstone's operating hours.  *See* McLaughlin Decl. Ex. C.  The attachments included information

18   on the FFCRA as well as other leave options.  *See id.*

19         Congress passed the FFCRA in the Spring of 2020 to help Americans with the various

20   challenges the COVID-19 pandemic created.  *See generally* Pub. L. No. 116-127 (2020).  One

21   division of the statute, the EFMLEA, allowed eligible employees in 2020 to take leave "because

22   of a qualifying need related to a public health emergency."  29 U.S.C. § 2612(a)(1)(F).  A

23   qualifying need included the "care for the son or daughter under 18 years of age of such employee

24   if the school or place of care has been closed, or the child care provider of such son or daughter is

25   unavailable, due to a public health emergency."  *Id.* § 2620(a)(2)(A).  The first ten days of leave

26   would be unpaid.  *Id.*  § 2620(b)(1).  After ten unpaid days, the EFMLEA required the employer

---

[1] All page citations are to the top right by the CM/ECF system.

1  to provide paid leave for "an amount that is not less than two-thirds of an employee's regular rate

2  of pay . . . ." *Id.* § 2620(b)(2)(A)–(B).  The provisions of the EFMLEA became part of the pre-

3  existing Family and Medical Leave Act (FMLA), which grants employees the right to take leave

4  for various reasons.  *See* 29 U.S.C. §§ 2611–2620.  Colloquially, seeking leave under the FFCRA

5  also is referred to as seeking "Expanded FMLA" leave.  *See* McLaughlin Decl. Ex. C.

6         To qualify for this leave, the employee needed to provide notice.  The EFMLEA required

7  employees, "where the necessity for leave . . . is foreseeable," to provide "such notice of leave as

8  is practicable."  *Id.* § 2620(c).  The EFMLEA leave provisions incorporated into the FMLA by

9  the FFCRA expired on December 31, 2020.  *See* 29 U.S.C. § 2612(a)(1)(F).

10        Congress gave the Department of Labor (DOL) authority to publish regulations to

11  implement the EFMLEA.  *See* 29 U.S.C. § 2620(a)(3).  The DOL's implementing regulation,

12  published in April 2020 (the April Rule), stated "notice may not be required in advance, and may

13  only be required after the first workday (or portion thereof) for which an Employee takes Paid

14  Sick Leave or Expanded Family and Medical Leave."  29 C.F.R. § 826.90(b), 85 FR 19326-01,

15  2020 WL 1663275, at *19354 (F.R.).

16        The April Rule also required employees to:

17              [P]rovide the Employer documentation containing the following
18              information prior to taking Paid Sick Leave under the EPSLA[2] or
19              Expanded Family and Medical Leave under the EFMLEA:

20              (1) Employee's name;

21              (2) Date(s) for which leave is requested;

22              (3) Qualifying reason for the leave; and

23              (4) Oral or written statement that the Employee is unable to work
24              because of the qualified reason to leave.

25  29 C.F.R. § 826.100, 85 FR 19326-01, 2020 WL 1663275, at *19355 (F.R.).  In August 2020, a

26  district court in the Southern District of New York vacated this notice portion of the April Rule

---

[2] The Emergency Paid Sick Leave Act (EPSLA) constituted Division E of the FFCRA and allowed an employee to take up to two weeks of paid sick leave.  *See* Pub. L. No. 116-127.

1  because it held the DOL exceeded its authority by requiring employees to submit documentation

2  to their employer prior to taking leave under the EFMLEA.  *New York v. U.S. Dep't of Labor*, 477

3  F. Supp. 3d 1, 17–18 (S.D.N.Y. 2020).  The district court ruled the provision was "a different and

4  more stringent precondition to leave" and thus was inconsistent with "the statute's unambiguous

5  notice provisions . . . ."  *Id.*

6      In response, the DOL issued a new temporary regulation (the September Rule).  The

7  September Rule required an employee to provide the same documentation as the April Rule but

8  now it was due, "as soon as practicable, which in most cases will be when the Employee provides

9  notice under § 826.90."  29 C.F.R. § 826.100(a), 85 FR 57677-01, 2020 WL 5531349, at *57691

10  (F.R.).  The DOL revised § 826.90(b) to state, "Notice for taking Expanded Family and Medical

11  Leave is required as soon as practicable.  If the reason for this leave is foreseeable, it will

12  generally be practicable to provide notice prior to the need to take leave."  29 C.F.R. § 826.90(b),

13  85 FR 57677-01, 2020 WL 5531349, at *57690–91 (F.R.).

14      The question of notice and leave is at the heart of the dispute between Roeder and

15  Ironstone over her termination on May 14, 2020.  Ironstone formalized its reopening plans in

16  early May 2020.  *See* Kautz Decl. ¶ 8; McLaughlin Decl. ¶ 10.  On May 5, 2020, McLaughlin and

17  Rochelle DeLong, Ironstone's general manager, called Roeder to discuss her return to work when

18  the vineyard was set to reopen.  *See* McLaughlin Decl. ¶ 11.  Management wanted Roeder to

19  work three days a week, Thursday through Saturday, for six hours a day.  *See id.*  The new

20  schedule would begin on May 14, 2020.  *Id.*  Roeder told them she still had a conflict because her

21  kids were at home, attending school remotely.  *Id.*  The next day, DeLong in a follow-up email

22  told Roeder if she was "unable to commit to the schedule . . . we will have to move forward with

23  filling your position."  Henderson Decl. Ex. E.  On May 7, Roeder left a voicemail for

24  McLaughlin indicating she wanted to discuss options relating to her employment.  *See id.* Ex. F.

25      Roeder and McLaughlin had another phone conversation on May 8, 2020.  McLaughlin

26  Decl. ¶ 12; Roeder Decl. ¶ 13, ECF No. 17-4.  During the May 8 phone call, Roeder requested

27  FFCRA/EFMLEA leave.  McLaughlin Decl. Ex. D.  McLaughlin sent a follow-up email the same

28  day informing Roeder she needed to fill out EFMLEA paperwork by Saturday, May 9, at 4:00

4

1   p.m. to take EFMLEA leave.  *Id*.  She also attached the same paperwork she had attached to the

2   April 21 email.  *Id*.  On May 9, Roeder emailed McLaughlin and told her she could not get the

3   forms to McLaughlin by the end of day and requested she be allowed to submit them on

4   Ironstone's next business day instead.  *Id*. Ex. E.  Roeder never returned the forms to Ironstone.

5   Pl.'s Roeder Dep. at 27:7–8.  On May 14, Roeder did not show up to work on her first scheduled

6   day back.  Kautz Decl. ¶ 9.  That same day, Stephen Kautz decided to terminate Roeder and sent

7   her a letter with information to that effect.  *Id*.; McLaughlin Decl. ¶ 17, Ex. F.

8         As noted above, Roeder also alleges she experienced harassment while working at

9   Ironstone.  In the Summer of 2019, Roeder had problems with Larry Moore, an employee of

10  another company who regularly worked at Ironstone.  *See* Pl.'s Roeder Dep. at 34:14–46:23.

11  Moore had left his truck in a place on the road at the vineyard that prevented a caterer from

12  entering the property.  *Id.* at 34:14–35:4.  Roeder moved Moore's truck.  *Id.* at 35:1–4.  Moore

13  became upset that Roeder had moved his truck.  *Id.* at 35:4–12.  Roeder reported that Moore used

14  expletives when speaking to her and told her to never touch "his stuff again or else," *id.* at 38:24–

15  25; he also deliberately bumped Roeder in the shoulder in the two-week period following

16  Roeder's moving of the truck, *id.* at 36:9–22 .  The two then spoke about the incident and

17  relations calmed down between them.  *Id.* at 37:14–18.  Moore and Larry Ringland, another

18  employee of a different company who worked at the vineyard, also allegedly heckled Roeder.  *Id.*

19  at 43:19–44:4.  They made fun of her for complaining about employees' swearing and called her

20  a "prude."  *See id*. at 45:15–22.

21        Roeder's allegations of harassment go beyond the conduct of Moore and Ringland.  That

22  same summer, the cook at Ironstone, a teenager named Anthony Merry, allegedly drew penises

23  and testicles on the coffee cups of Ginger Von Aspern, Stephen Kautz's executive assistant.

24  McLaughlin Decl. ¶ 4; Asbill-Bearor Decl. Ex. E (Pl.'s Von Aspern Dep.) at 242:18–248:12.

25  Merry also allegedly wrapped vegetables in a way that resembled a penis and testicles and left

26  them throughout the work areas at Ironstone.  Pl.'s Roeder Dep. at 51:20–53:15.  Kautz fired

27  Merry on September 12, 2019.  McLaughlin Decl. ¶ 5.

28  /////

Roeder also alleges other forms of harassment. A warehouse worker named Jordan Moskovitz kept a calendar of bikini-clad women at his workspace. Pl.'s Roeder Dep. at 57:4–59:24. Roeder confronted him about it and Moskovitz agreed it was an inappropriate item for the workplace and removed the calendar. *See id*. Also, Von Aspern had a lipstick tube that was shaped like a penis and "trucknuts," a set of fake testicles that can hang on a vehicle's trailer hitch, in her cubicle area. *Id*. at 57:24–59:24; Pl.'s Von Aspern Dep. at 249:14–251:3.

## II.    PROCEDURAL BACKGROUND

Roeder initially filed suit in Calaveras County Superior Court against Kautz Vineyards. Henderson Rem. Decl. Ex. B (Compl.), ECF. No. 1-2. Kautz removed this action to federal court based on federal question jurisdiction. Notice Rem., ECF No. 1. Roeder makes the following allegations: that Kautz interfered with her FFCRA/EMFLEA rights, that she suffered from sexual discrimination and sexual harassment in violation of California's Fair Housing and Employment Act (FEHA), that Kautz failed to prevent discrimination and failed to investigate discrimination in violation of the same statute, and that Kautz terminated Roeder's employment in violation of public policy. *See generally id*. She seeks special, general, and punitive damages, attorneys' fees and liquidated damages, as well as equitable relief. *Id*. at 21.

Kautz moves for summary judgment on all of Roeder's claims and for summary adjudication of Roeder's prayer for punitive damages. *See* Mot. Summ. J. (Mot.), ECF No. 13. The issue is fully briefed. *See* Mem., ECF No. 13-1; Opp'n, ECF No. 17; Reply, ECF No. 18. The court heard argument on the motion on November 21, 2024. *See* Mins. Mot. Hr'g, ECF No. 31. Natalia Asbill-Bearor appeared on behalf of Roeder. *Id*. Joshua Henderson appeared on behalf of Kautz Vineyards. *Id*.

## III.    LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. The court views the record in the light most favorable

1    to the nonmoving party and draws reasonable inferences in that party's favor.  *Matsushita Elec.*

2    *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes v. S.H. Kress & Co.*, 398

3    U.S. 144, 157 (1970).  Summary adjudication is evaluated under the same standard, "giving the

4    nonmoving party in each instance the benefit of all reasonable inferences." *Am. Civil Liberties*

5    *Union of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

6    **IV.    EVIDENTIARY OBJECTIONS**

7           The court first resolves a threshold evidentiary dispute.  Under Federal Rule of Civil

8    Procedure 56, litigants who move for or oppose summary judgment must cite "particular parts of

9    materials in the record" to show specific facts are disputed, undisputed or cannot be proved, as

10   the case may be.  *See* Fed. R. Civ. P. 56(c)(1).  This district's local rules implement that rule by

11   requiring a separate statement proposing undisputed facts.  *See* E.D. Cal. L.R. 260(a).  The

12   separate statement must "cite the particular portions" of the record that establish each proposed

13   fact as "undisputed." *Id.*  The opposing party must then respond to each proposed fact on the list

14   and either admit or deny that the fact is undisputed.  *See* E.D. Cal. L.R. 260(b).  If the opposing

15   party contends the fact is disputed, it must cite "the specific particular portions" of the record

16   showing the fact is disputed.  *Id.*

17          Roeder and Kautz filed the required separate statements alongside their motion.  *See*

18   *generally* Def.'s Stmt. Undisp. Facts (SUMFs), ECF No. 13-2; Pl.'s. Opp'n Def.'s Stmt. Undisp.

19   Facts (Pl.'s Fact Opp'n), ECF No. 17-2.  Kautz's proposed undisputed facts are based on

20   declarations by Stephen Kautz and Karen McLaughlin, portions of the deposition transcripts of

21   Sarah Roeder, McLaughlin, Rochelle DeLong and Ginger Von Aspern and copies of emails

22   exchanged between Kautz Vineyards and Roeder in the Spring of 2020.  *See generally* Def.'s

23   SUMFs.  Roeder's disputed facts rely on deposition excerpts from Roeder, DeLong, Von Aspern

24   and McLaughlin as well as Kautz's answers to interrogatories sent by Roeder.  *See generally* Pl.'s

25   Fact Opp'n.  Plaintiff also provides a declaration from Roeder, ECF No. 17-4, and requests the

26   court take judicial notice of various public health warnings and orders relating to COVID-19 in

27   the Spring of 2020 as well as statutes and regulations relating to the EFMLEA.  *See* ECF No. 17-

28   6.

7

1    Both parties have filed objections. *See* ECF Pl.'s Objs., ECF No. 17-5, Def.'s Objs., ECF

2    No. 18-3. The court first addresses objections from both sides that pertain to relevance and form.

3    Both sides make objections based on relevance, speculation, and improper legal conclusions. *See*

4    *e.g.* Def.'s Objs. No. 4 at 4 (objecting to one of Roeder's declarations on relevance grounds). Yet

5    "objections to evidence . . . that it is irrelevant, speculative, and/or argumentative, or that it

6    constitutes an improper legal conclusion are all duplicative of the summary judgment standard

7    itself." *Burch v. Regents of University of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal.

8    2006). If a fact is not material, i.e., if it is irrelevant or is a legal conclusion or speculative, it is

9    not germane to a Rule 56 analysis. An objection is not needed. Many other objections relate to

10   the form in which the evidence was provided. *See, e.g.,* Def.'s Objs. No. 1 at 2 (objecting to one

11   of Roeder's exhibits as not properly authenticated). But "to survive summary judgment, a party

12   does not necessarily have to produce evidence in a form that would be admissible at trial, so long

13   as the party satisfies the requirements of Federal Rule of Civil Procedure 56." *Fraser v. Goodale*,

14   342 F.3d 1032, 1036–37 (9th Cir. 2003). Both parties' objections, other than those specified

15   below, are overruled to the extent the court has relied on any of the disputed evidence in this

16   order.

17   Kautz's first objection to the declaration of Roeder is sustained because Roeder has not

18   established she had personal knowledge of Calaveras County's policies on the reopening of

19   wineries in the Spring of 2020. *See* Def.'s Objs. at 3; Roeder Decl. ¶ 6. Kautz's third objection

20   to Roeder's declaration is sustained because Roeder has not established she had personal

21   knowledge that everyone working in the kitchen witnessed Anthony Merry draw phallic images

22   on Von Aspern's coffee cups. *See* Def.'s Objs. at 3; Roeder Decl. ¶ 21. Kautz's ninth objection

23   to Roeder's declaration is sustained because Roeder has not established she has personal

24   knowledge of how many employees worked at Kautz Vineyards. Def.'s Objs. at 7; Roeder Decl.

25   ¶ 31.

26   **IV.    ANALYSIS**

27   Kautz seeks summary judgment on Roeder's six claims and summary adjudication on

28   Roeder's prayer for punitive damages. The court addresses each in turn.

1    **A.    FFCRA/EMFLEA Interference (Claim One)**

2        Kautz seeks summary judgment on Roeder's FFCRA/EMFLEA interference claim

3    because it argues Roeder failed to provide adequate notice that she was taking leave and failed to

4    submit written documentation of her request for leave.  In the alternative, Kautz argues § 259 of

5    the Fair Labor Standards Act (FLSA) provides a complete defense as it was following an

6    administrative regulation in good faith when it terminated Roeder's employment.  *See* Mem. at 9–

7    14.  The court disagrees that it can resolve this question as a matter of law.

8        As noted above, Congress incorporated the EFMLEA into the FMLA through the FFCRA.

9    *See* 29 U.S.C. §§ 2611–2620.  Parties injured by employers interfering with their

10   FFCRA/EFMLEA rights can thus obtain relief provided they can prove the same elements as a

11   party seeking relief under an ordinary FMLA interference claim.  *See* 29 U.S.C. § 2615.  To make

12   out a prima facie interference case under the FMLA, a plaintiff must show: (1) they were eligible

13   for the FMLA's protections, (2) the employer is covered by the FMLA, (3) the employee was

14   entitled to leave under the FMLA, (4) the employee provided sufficient notice of their intent to

15   take the leave, and (5) the employer denied the employee their FMLA benefits to which they were

16   entitled.  *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011) (internal marks and

17   citations omitted).

18       The parties do not contest Roeder was a qualified employee under the FMLA in the

19   Spring of 2020.  Opp'n at 13.  The parties do not contest the FFCRA/EFMLEA provisions within

20   the FMLA covered Kautz Vineyards.  *See id.*  They also do not disagree that Roeder had a

21   qualifying need, as her children were at home attending school virtually over Zoom in April 2020.

22   *See id.*  The parties contest only elements four and five: whether Roeder gave Kautz proper notice

23   and whether Roeder provided Kautz with the proper FFCRA/EFMLEA documentation that, if

24   completed, would entitle her to FFCRA/EFMLEA benefits.  *See id.*

25       Recapping the facts set forth above, the undisputed facts relating to this claim are as

26   follows:

27       • On April 20, 2020, Roeder informed Karen McLaughlin, Ironstone's Human

28         Resources Manager that she was available on nights and weekends because her

9

1    children were at home attending school over Zoom and her husband was working

2    during the day.  Roeder made a request to McLaughlin about what leave options

3    were available to her.

4    • On April 21, 2020, McLaughlin sent Roeder a follow-up email that included

5      paperwork related to taking FFCRA/EFMLEA leave.

6    • On May 5, 2020, McLaughlin and Rochelle DeLong, Ironstone's General

7      Manager, informed Roeder that Ironstone wanted her to work a three-day work

8      schedule, Thursday through Saturday, for six hours a day, beginning on May 14,

9      2020.  Roeder told them of her continuing conflict with having to supervise her

10     children who were attending school remotely.

11   • On May 6, 2020, DeLong emailed Roeder, telling her Ironstone needed a response

12     by May 7, 2020, or they would have to "move forward with filling your position."

13   • On May 7, 2020, Roeder communicated to McLaughlin that she wanted to talk

14     through some employment options.

15   • On May 8, Roeder communicated to McLaughlin that she wanted to take

16     FFCRA/EFMLEA leave.  McLaughlin sent a follow-up email that attached

17     FFCRA/EFMLEA forms and required Roeder to return them by May 9.

18   • On May 9, Roeder emailed Mclaughlin and told her she could not get the forms in

19     until Tuesday, May 12—the next day Kautz was open for business.

20   • Roeder did not return the forms.

21   • On May 14, 2020, the first day Roeder was scheduled to return to work, she did

22     not show up and Kautz sent her a letter notifying her it was terminating her

23     employment.

24   *See generally supra* at 1–6.

25         There are two disputed facts relevant to this controversy, however.  The first is Roeder's

26   reason for not turning in the paperwork after May 9, 2020.  Roeder argues she could not return

27   the forms because it was unsafe to leave her children unattended and she lives in a remote part of

28   California.  Roeder Decl. ¶ 16.  Kautz, however, argues that Ironstone "was open during non-

1  school hours and weekends when Ms. Roeder's children were not in school." Def.'s Resp. to

2  Pl.'s. Stmt. Disp. Mat. Facts (Response) No. 31, ECF No. 18-1. The second is whether Kautz had

3  a policy of requiring an employee to provide hard copies of signed EFMLEA leave forms as

4  written notice in advance of taking FMLA leave. Kautz, relying on testimony from McLaughlin,

5  argues it had such a policy while Roeder denies Kautz had such a policy. *Compare* McLaughlin

6  Decl. ¶¶ 9, 13 *with* Asbill-Bearor Decl. Ex. B (McLaughlin Dep.) at 151:6–153:8.

7          Viewed in the light most favorable to Roeder, she provided sufficient notice to Kautz of

8  her desire to take FFCRA/EFMLEA leave. Kautz was on notice as early as April 20, 2020, that

9  Roeder required FFCRA/EFMLEA leave. *See* McLaughlin Decl. ¶ 8. Roeder unequivocally told

10 Kautz she had a conflict that would qualify her for FFCRA/EFMLEA leave: her children were at

11 home attending school over Zoom. *See id*. Kautz was aware of this qualifying event as

12 evidenced by its sending her EFMLEA forms. *Id.* ¶¶ 8– 9. Further, when Kautz definitively set

13 the work schedule for Roeder to return, she notified Kautz by telephone of her desire to take

14 EFMLA leave within three days. *Id.* ¶ 12. Roeder provided sufficient notice of her desire to take

15 EFMLA leave.

16         Regarding documentation, the parties agree that Roeder never filled out the EFMLEA

17 paperwork. *See* Pl.'s Fact Opp'n No. 44. The disagreement turns on when and if Roeder was

18 required to fill out and hand in hard copies of the paperwork to Kautz under the FFCRA. Roeder

19 argues Kautz did not give her a "practicable" amount of time to fill out the paperwork and that

20 documentation was required only once Roeder was to receive paid leave, after ten days, but not

21 immediately once she began leave. *See* Opp'n at 17–20. Kautz argues instead Roeder either

22 needed to turn in the paperwork before her first day of leave or when her leave request became

23 "foreseeable." *See* Mem. at 9–14.

24         The statutory language of the FFCRA governs this controversy. As Kautz recognizes,

25 both in its briefs and at oral argument, the district court in New York vacated the portions of the

26 April Rule that related to written documentation requirements. *Id.* at 11; *New York v. U.S. Dep't*

27 *of Labor*, 477 F. Supp. 3d at 17–18. That New York court's order, which the DOL did not

28 appeal, vacated the regulation's requirement for the entire country. *See id.* at 18 (citing 5 U.S.C. §

706(2) (allowing a reviewing court to set aside agency actions that are arbitrary and capricious or

in violation of "constitutional right, power, privilege or immunity")).  When a rule is subject to

vacatur, the legal landscape *status quo ante* governs any subsequent controversy arising under the

statute in question.  *See Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d. 847, 855 (D.C. Cir.

1987).  The version of section 826.100 adopted under the April Rule, *see supra* at 4, thus cannot

be applied to this case as it was vacated, s*ee id.*  Further, the later September Rule, adopted well

after Roeder had been fired on May 14, 2020, also cannot be applied to this controversy as courts

cannot retroactively apply administrative rules written subject to the Administrative Procedure

Act (APA).  *See Georgetown University Hosp. v. Bowen*, 821 F.2d 750, 757 (D.C. Cir. 1987)

("[R]ules adopted pursuant to rulemaking procedures under the APA are to be prospective in

application only.").  Here, Congress authorized the DOL to make rules implementing the

EFMLEA subject to the requirements of the APA.  *See* 29 U.S.C. § 2620(a)(3).  Thus, this court

cannot apply either the April or September Rule when determining whether Roeder provided

adequate notice and documentation to Kautz.  Instead, the court applies the standard set by the

EMFLEA itself: that "where the necessity for leave . . . is foreseeable" an employee must provide

"such notice of leave as is practicable."  *Id.* § 2620(c).

There is one more regulation worth considering.  Title 29 C.F.R. 826.90(d), a portion of

the April Rule the district court in New York did not vacate, provides "it is reasonable for the

employer to require the employee to comply with the employer's usual notice procedures and

requirements, absent unusual circumstances."  2020 WL 1663275, at  *19339.  Title 29 C.F.R. §

826.90(d), however, cannot be more stringent than the practicability requirement, otherwise it

would fail—much as the April Rule's documentation requirement failed—because it would

conflict with the plain meaning of the FFCRA.  *See New York v. U.S. Dep't of Labor*, 477 F.

Supp. 3d at 18 (overturning April rule because it conflicted with plain-meaning of the FFCRA).

The best reading of § 826.90(d), then, is that employer notice requirements are to be followed

when practicable.  Section 826.90(d) thus requires answering the question whether Kautz gave

Roeder a "practicable" amount of time to provide written documentation.

/////

There is a dispute of material fact regarding whether Kautz denied Roeder her FFCRA/EFMLEA benefits by not giving her a practicable amount of time to submit written notice.  Kautz required Roeder to submit documentation by May 9, 2020, five days in advance of her first day of leave.  *See* McLaughlin Decl. ¶ 12.  Roeder says she struggled to provide documentation after May 9 because of her childcare duties and because she lives in a remote area, at a distance from the vineyard.  *See* Roeder Decl. ¶ 16.  Furthermore, there is no evidence Kautz would have allowed Roeder to submit the FCCRA/EFMLEA documentation after May 9.  Even if this timeline would have been practicable for Roeder to give written notice—a question for the jury—there also is a dispute of material fact over whether Kautz had a written policy requiring documentation before an employee could take FFCRA/EMFLEA leave at all and whether Roeder needed to turn in hard copies of the documentation to Kautz to comply with its policy.  *Compare* McLaughlin Decl. ¶¶ 9, 13 *with* McLaughlin Dep. at 151:6–153:8.

Finally, Kautz argues Roeder failed to provide written documentation when her requested leave became "foreseeable."  Reply at 3–4.  This argument relies on the revised language of 29 C.F.R. § 826.90 following adoption of the September Rule.  *See id.*  As noted above, the September Rule cannot be given retroactive effect.  The FFCRA addresses foreseeability, but only to note that employees must give notice in a practicable amount of time when their need for leave becomes foreseeable.  29 U.S.C. § 2620(c).  There is a factual dispute as to whether Roeder was given a practicable amount of time to submit written documentation in support of her FFCRA/EFMLEA claim.

### 1.    Section 259 as an Affirmative Defense

Kautz argues that even if Roeder can prove Kautz interfered with her FFCRA/EFMLEA rights, it relied in good faith on a written administrative regulation issued by the DOL and that under 29 U.S.C. § 259 it is "insulated from liability" even though a court eventually found the regulation to be invalid.  *See* Mem. at 17–19.  As an initial matter, the court must determine whether § 259 applies to Roeder's claim of FFCRA/EFMLEA interference.

Section 259 was originally part of the Portal-to-Portal Act of 1947, which limited liability in a variety of contexts employers had experienced under the Fair Labor Standards Act (FLSA) of

1   1938.  *See* 29 U.S.C. § 251.  § 259 of the Portal-to-Portal Act grants employers immunity under

2   the FLSA if they relied in good faith on administrative regulations published by the DOL.  *See id.*

3   Since its passage, Congress has expressly incorporated § 259 into other statutes, including the

4   Age Discrimination in Employment Act.  *See* 29 U.S.C. § 626(e).  Congress, however, has not

5   expressly incorporated § 259 into the FMLA.  Nor has it expressly incorporated § 259 into the

6   FFCRA.

7          The question thus is whether the FFCRA impliedly incorporated § 259 into its EMFLEA

8   provisions.  The FFCRA has a Russian doll-like structure.  It contains statutes within statutes,

9   framed as "divisions."  *See*, *e.g.*, Pub. L. No. 116-127, Div. C (2020).  These divisions are

10  unrelated to one another.  Instead, they are connected to other, pre-existing statutes, such as the

11  FMLA.  *See*, *e.g.*, *id.*  Divisions have their own enforcement mechanisms, and sometimes their

12  own clauses authorizing regulatory rulemaking.  *See id.*

13         As noted above, Division C, the EFMLEA, is an amendment to the original FMLA.  *See*

14  *id.*  The division grants the DOL rulemaking power in accordance with the APA.  *See* 29 U.S.C.

15  § 2620(a)(3).  There are no explicit enforcement mechanisms, no references to the FLSA, and no

16  explicit incorporation of § 259 within the EFMLEA.  Because there is no evidence that either the

17  FMLA itself or amendments to the FMLA in the FFCRA incorporate § 259, the court finds

18  Congress did not intend to provide defendants § 259 as an affirmative defense to

19  FFCRA/EFMLEA interference claims like Roeder's.

20         Kautz argues that two other district courts have allowed defendants to plead § 259 as an

21  affirmative defense to FFCRA claims: *Spells v. Physician and Tactical Healthcare Services, LLC*,

22  615 F. Supp. 3d 230, 246–48 (D. N.J. 2022), and *Connor v. Professional Medical Billing, Inc.*,

23  607 F. Supp. 3d 838 (D. Ind. 2022).  The courts in these cases generally examined divisions

24  within the FFCRA that (1) explicitly had enforcement provisions where (2) those enforcement

25  provisions had been cross-referenced from the FLSA.  *See Spells*, 615 F. Supp. 3d at 242 (citing

26  section 5105 of the FFCRA, which cross-references enforcement mechanisms from the FLSA to

27  /////

28  /////

14

1    enforce the EPSLA).  The implied incorporation of § 259 is far more plausible for the EPSLA,

2    which expressly incorporate the FLSA's enforcement provisions, than it is for the EFMLEA.  *See*

3    *id.*

4          The court in *Connor* also found the EFMLEA incorporated § 259 in considering the

5    damages provision of the FMLA.  *See* 607 F. Supp. 3d at 846.  The court found the implied

6    incorporation of § 259 because the FMLA grants "lost wages" as one of its remedies and

7    employers need to calculate the "regular rate of pay" an employee would have received while on

8    leave using the FLSA's calculations.  *Id.*  Under the EFMLEA, an employee could receive lost

9    wages as calculated under the FLSA as a remedy.  *Id.*  For the *Connor* court, this connection was

10   enough to show Congress impliedly authorized a § 259 defense for FFCRA/EFMLEA

11   interference claims.  *See id.*

12         The court finds the causal chain too attenuated to reach the same conclusion as the court

13   in *Connor*.  If anything, the damages provision of the FMLA strongly suggests Congress did not

14   intend to incorporate § 259 into the statute.  *See* 29 U.S.C. § 2617.  The provision has a tripartite

15   structure.  *See id.*  First, plaintiffs can recover lost wages.  Second, plaintiffs can recover interest

16   at the prevailing rate, and, third, plaintiffs can recover liquidated damages that can equal "the

17   sum" of the lost wages plus interest.  *See id.*  An affirmative defense is available to a defendant in

18   the liquidated damages provision.  *See id.* § 2617(a)(1)(A)(iii).  If the defendant can show in

19   "good faith" that it had "reasonable grounds for believing that the act or omission was not a

20   violation of [the FMLA]" a court in its discretion can reduce the award to just lost wages and

21   interest with no liquidated damages.  *Id.*

22         Under Kautz's theory, § 259 would render the good faith partial defense under the

23   liquidated damages provision meaningless as defendants would exclusively rely on § 259 as

24   providing a complete defense to any liability.  This court finds it more likely that Congress

25   intentionally refrained from incorporating § 259 into the FMLA because it opted instead to

26   provide a partial defense based on good faith.  Kautz cannot rely on § 259 as an affirmative

27   defense to Roeder's FFCRA/EFMLEA interference claim.

28   */////*

15

1    The court denies Kautz's motion for summary judgment of Roeder's FFCRA/EFMLEA

2    interference claim.

3    **B.        Sexual Discrimination (Claim Two)**

4    Roeder alleges she suffered disparate treatment based on her gender and as a result

5    experienced a "loss of wages and other benefits she would have earned but for the disparate

6    treatment in violation of the FEHA." Compl. ¶ 32. Kautz seeks summary judgment arguing

7    Roeder (1) has not alleged Kautz's reasons for her termination were pretextual, and (2) has not

8    shown Kautz's termination of her employment was substantially caused by gender discrimination.

9    Mem. at 20–22. Here, the court agrees it can resolve this claim as a matter of law given the

10   record before it.

11   Under the FEHA, an employer is barred from discharging a person from employment

12   based on their gender. Cal. Gov't Code §12940(a). "Because of the similarity between state and

13   federal employment discrimination laws, California courts look to pertinent federal precedent

14   when applying our own statutes." *Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 354 (2000).

15   California courts thus apply the *McDonnell Douglas* burden shifting framework: "the plaintiff

16   must provide evidence that (1) [she] was a member of a protected class, (2) [she] was qualified

17   for the position she sought or was performing competently in the position [she] held, (3) [she]

18   suffered an adverse employment action, such as termination, demotion, or denial of an available

19   job, and (4) some other circumstance suggests discriminatory motive." *Id.* at 355 (citations

20   omitted).

21   Here, it is undisputed that Roeder is a woman and a member of a protected class, was

22   qualified for her position, and suffered an adverse employment action. *See* Opp'n at 25. The

23   parties contest only the fourth element: that there was some other circumstance suggesting gender

24   discrimination. *See id.* Roeder provides five types of evidence she says show there was gender

25   discrimination at Ironstone. *See id.* at 25–27. While the parties disagree on minor details of these

26   allegations, they generally accept that the actions as described by Roeder took place except for

27   one fact discussed below. *See generally* Pl.'s Fact Opp'n.

28   /////

First, Roeder claims she experienced hostile conduct by Larry Moore after she moved a truck he was driving on the property in the Summer of 2019.  This conduct included Moore's yelling at her and even allegedly bumping Roeder in the hallway for several weeks after the initial incident.  *See supra* at 5.  Roeder claims Moore generally was inhospitable to all workers, including to men, but that he was "more aggressive towards women."  Roeder Decl. ¶ 28.  Second, Roeder claims the chef Anthony Merry made and displayed a series of inappropriately phallic culinary creations throughout the Summer of 2019.  Merry, for example, drew penises onto the coffee cups of co-worker Ginger Von Aspern.  McLaughlin Decl. ¶ 4; Pl.'s Von Aspern Dep. at 242:18–248:12.  He also allegedly transformed produce around the kitchen into phallic depictions and put them on Ms. Von Aspern's chair and desk.  Pl.'s Roeder Dep. at 51:20–53:15.  Third, Roeder claims there were other graphic depictions visible in the workplace, of male genitalia and of nearly naked women, including a lipstick container shaped like a penis, "truck nuts" and a calendar of women depicted in bikinis.  *See* Pl.'s Roeder Dep. at 57:4–59:24;  Fourth, Roeder claims she was heckled by Moore and Larry Ringland for being a "prude" after she complained about their use of foul language.  Pl.'s Roeder Dep. 45:15–22.  The fifth fact is fully disputed:  Roeder submits McLaughlin told her over the phone on May 5, 2020, that Roeder needed to choose between her job and her family, which Roeder alleges infers sexual discrimination as Kautz disregarded the needs of women workers who have children.  *Compare* Roeder Decl. ¶ 11 *with* McLaughlin Dep. at 162:20–22.

Under the lenient standard of the *McDonnell Douglas* burden shifting framework, Roeder has provided sufficient evidence of circumstances suggesting practices that make it harder for women to work at Kautz..  *See Guz*, 24 Cal. 4th at 355 (describing plaintiff's burden in making out prima facie employment discrimination case as "not being onerous"); *Ibarbia v. Regents of Univ. of Calif.*, 191 Cal. App. 3d 1318, 1328 (1987) ("To establish a prima facie case of employment discrimination through disparate impact . . . plaintiff need not show that the employer had a discriminatory intent but need only demonstrate that a particular practice in actuality operates to exclude members of [her gender]").

/////

17

1    Once a plaintiff has made out a prima facie case, the burden shifts to the defendant to

2 present a credible nondiscriminatory reason to subject the employee to an adverse employment

3 decision. *See Guz*, 24 Cal. 4th at 333. Here, Kautz claims it fired Roeder for not showing up to

4 work for her shift on May 14, 2020, and for not completing the FFCRA/EFMLEA paperwork

5 given to her by McLaughlin before that date. *See* Mem. at 5. While a jury may find these reasons

6 violate the FFCRA, as discussed above, failing to show up to work is a legitimate and non-

7 discriminatory reason for the purposes of a FEHA gender discrimination claim. *See, e.g.*, *Kelly v.*

8 *Wal Mart Stores*, 291 F. Supp. 1145, 1154 (S.D. Cal. 2017) (finding failure to show up for work

9 in transgression of corporate policy is "undoubtedly a legitimate basis for terminating

10 employment").

11    Roeder claims Kautz has not provided a legitimate non-discriminatory reason for her

12 termination, arguing Kautz was inconsistent in its stated reasons for her termination. *See* Opp'n

13 at 25–27. Roeder points to the disputed fact that McLaughlin told Roeder she needed to choose

14 between her job and her family. Roeder Decl. ¶ 11. Roeder also argues that denying

15 FFCRA/EMFLEA claims has a disproportionate and negative impact on women, as Congress

16 passed the original FMLA to alleviate women's disproportionate share of childrearing duties. *See*

17 *id.* at 26 (citing S. Rep. 103-3, S. Rep. No. 103D Cong., 1st Sess. 1993, 1993 WL 22195, 1993

18 U.S.C.C.A.N. (Leg. Hist.)).

19    Roeder's arguments are unpersuasive. First, there is no evidence from which a factfinder

20 can draw a reasonable inference that Kautz was inconsistent in its rationale for terminating

21 Roeder's employment. All of the evidence, taken in the light most favorable to Roeder, points to

22 Kautz's requiring Roeder work from Thursday to Saturday during the day beginning on May 14,

23 2020. *See supra* at 1–6. Her inability to do so and her not showing up to work without

24 submitting the FFCRA/EFMLEA forms was the basis of her termination. None of Roeder's other

25 arguments, even if taken as true, undermines Kautz's proffered legitimate reason for terminating

26 Roeder's employment. The evidence of sexual harassment Roeder offers happened in 2019 and

27 the alleged perpetrators' conduct had no bearing on her termination in the Spring of 2020. *See id*.

28 McLaughlin's alleged statement that Roeder needed to choose between her job and her family

1    supports Kautz's argument that Roeder was terminated for not showing up to work on May 14.

2    And Roeder's contention that denying FMLA benefits disproportionately impacts women is at

3    best conclusory and does not defeat Kautz's assertion that it terminated her for not coming to

4    work.  Kautz has provided a legitimate nondiscriminatory reason for Roeder's termination.

5           If an employer offers a legitimate non-discriminatory reason for an adverse employment

6    decision, the plaintiff must then provide evidence the reason was pretextual.  *Guz,* 24 Cal.4th at

7    356.  Here, Roeder does not allege or argue pretext and instead relies only on arguing that Kautz

8    did not have a legitimate non-discriminatory reason for firing her.  *See generally* Opp'n at 25–27.

9    Thus, Roeder's discrimination claim must fail.

10          Roeder has not shown she can prevail on a gender discrimination claim under the FEHA.

11   The court grants summary judgment to Kautz on Roeder's second claim.

12          **C.       Hostile Work Environment (Claim Three)**

13          Roeder claims she was subjected to sexual harassment pervasive enough to create a hostile

14   work environment while working at Ironstone.  *See* Compl.  ¶¶ 34–37.  Kautz seeks summary

15   judgment, arguing Roeder's claim fails because the unprofessional behavior of her co-workers

16   was not severe or pervasive enough to sustain a hostile work environment claim.  *See* Mem. at

17   22–26.  The court agrees this claim can be resolved as a matter of law because Roeder has not

18   provided evidence the alleged harassment interfered with her work performance.

19          FEHA makes it an unlawful employment practice to harass employees because of their

20   sex.  *See* Cal. Gov't Code § 12940(j)(1).  To prove a claim of sexual harassment, a plaintiff must

21   show she was a member of a protected class; she was subjected to unwelcome harassment based

22   on that protected status; the harassment "unreasonably interfered" with her work performance "by

23   creating an intimidating, hostile, or offensive work environment;" and the defendant is liable.

24   *Ortiz v. Dameron Hosp. Ass'n,* 37 Cal. App. 5th 568, 581 (2019).

25          The California Supreme Court has held "to prevail, an employee claiming harassment

26   based upon a hostile work environment must demonstrate that the conduct complained of was

27   severe enough or sufficiently pervasive to alter the conditions of employment and create a work

28   environment that qualifies as hostile or abusive to employees because of their sex."  *Miller v.*

19

1    *Dep't of Corrs.*, 36 Cal. 4th 446, 462 (2005) (citations omitted). These circumstances include an

2    evaluation of the "frequency of the discriminatory conduct; its severity; whether it is physically

3    threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

4    with an employee's work performance." *Miller*, 36 Cal. 4th at 462 (internal marks and citations

5    omitted).

6        Roeder offers the same set of facts in support of her hostile work environment claim as

7    she offered for her FEHA sexual discrimination claim. The court finds there is a dispute of

8    material fact over whether Roeder experienced conduct that was pervasive enough for a hostile

9    work environment claim. In particular, Roeder's claim that Anthony Merry placed objects shaped

10    like penises "at least ten times" around the workplace suggests a reasonable person could find

11    Kautz allowed Ironstone to operate as a hostile work environment. *See* Pl.'s Roeder Dep. at

12    47:17–49:20; 51:24.

13        Roeder, however, has not pointed to evidence to show her work performance suffered as a

14    consequence. Merry was fired on September 12, 2019, well before Roeder lost her job.

15    McLaughlin Decl. ¶ 5. As noted above, there is no causal connection between Roeder's ultimate

16    firing in May 2020 and the conduct she alleges took place in the Summer of 2019. Nor does

17    Roeder allege she was passed up for promotion, was unable to do her job or hated her job as a

18    consequence of these acts. *See Ortiz*, 37 Cal. App. 5th at 581 (requiring alleged harassment to

19    "unreasonably interfere" with plaintiff's work). In fact, the record supports a conclusion the

20    opposite was true. Roeder was upset over her termination precisely because she "loved [her] job.

21    I took a lot of pride in it. I did a good job, and I wanted to [work there until I] retire[d]." Pl.'s

22    Roeder Dep. at 62:17–18; *see also* Roeder Decl. ¶ 5 ("I loved my job and wanted to keep my

23    job . . .). Because she cannot show she suffered as a result of the alleged conduct, Roeder's

24    hostile work environment claim cannot succeed as a matter of law.

25        The court grants Kautz's motion for summary judgment as to Roeder's third claim.

26    **D.  Failure to Prevent Discrimination (Claims Four and Five)**

27        Kautz seeks summary judgment on Roeder's claims that Kautz failed to prevent

28    discrimination and failed to investigate the alleged discrimination because Roeder has failed to

1   show she experienced intentional discrimination or a hostile work environment.  *See* Mem. at 26–

2   27.  Here as well, the court agrees.

3        Under the FEHA, an employer is required to "take all reasonable steps necessary to

4   prevent discrimination and harassment from occurring."  Cal. Gov't Code § 12940(k).  Employers

5   also are required to investigate allegations of harassment.  *Id.* § 12490(j).  Both parties at oral

6   argument conceded that California courts have interpreted these clauses to be derivative claims

7   that do not provide litigants with independent claims.  *See Trujillo v. N. Cty. Transit Dist.*, 63 Cal.

8   App. 4th 280, 288–89 (1998).  Harassment must actually occur before a litigant can prove an

9   entity failed to prevent the harassment from happening or failed to investigate the harassment.

10   *See id.* at 289.

11        Here, as stated above, Roeder fails to show there is a dispute of material fact whether

12   discrimination or a hostile work environment took place at Kautz so as to survive summary

13   judgment.  Therefore, she cannot properly plead a failure to prevent harassment claim or a failure

14   to investigate harassment claim under the FEHA.  The court grants Kautz's motion for summary

15   judgment as to Roeder's fourth and fifth claims.

16       **E.**    **Wrongful Termination in Violation of Public Policy (Claim Six)**

17        Kautz seeks summary judgment on Roeder's sixth claim because it argues Kautz did not

18   violate any underlying public policy.  The court disagrees.

19        A wrongful termination or "*Tameny*" claim, *see Tameny v. Atlantic Richfield Co.*, 27

20   Cal.3d 167 (1980), requires a plaintiff show "(1) an employer-employee relationship;

21   (2) termination in violation  or other adverse employment action, (3) the termination or adverse

22   employment action was a violation of public policy, (4) the termination or adverse employment

23   action was a legal cause of plaintiff's damages, and (5) the nature and extent of the damages."

24   *Lavin v. United Techs. Corp.*, No. 2:13-cv-09384, 2015 WL 847392, at *19 (C.D. Cal. Feb. 23,

25   2015) (citing *Holmes v. Gen. Dynamics Corp.*, 17 Cal. App. 4th 1418, 1426 (1993)).

26        To prove a wrongful termination in violation of public policy claim, a plaintiff can show

27   the policy is "supported by either constitutional or statutory provisions."  *Stevenson v. Sup. Ct.*,

28   16 Cal. 4th 880, 890 (1997).  The policy "must be public in the sense that it inures to the public

1   rather than serving merely the interests of the individual." *Id.* (internal marks omitted).  Finally,

2   the policy "must have been articulated at the time of the discharge." *Id.*  The Ninth Circuit has

3   found that the FMLA meets the requirements set forth in *Stevenson* and a person terminated in

4   violation of the FMLA can pursue a claim for wrongful termination in violation of public policy.

5   *See Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1137–38 (9th Cir. 2003).

6          Here, Roeder was an employee of Kautz.  *See* Kautz Decl. ¶ 3.  She experienced an

7   adverse employment action.  *See* McLaughlin Decl. ¶ 17, Ex. F..  The termination is allegedly the

8   legal cause of her damages, and she points to evidence that would allow her to prove the extent of

9   the damages through lost wages and emotional distress.  *See* Roeder Dep. at 62:17–23.  As noted

10  above, there is a triable issue of material fact as to whether Roeder was terminated in violation of

11  the FMLA.  If a jury finds she was, Roeder may also be able to show she was terminated in

12  violation of public policy.  *See Xin Liu*, 347 F.3d at 1137–38.

13         The court thus denies Kautz's request for summary judgment as to Roeder's wrongful

14  termination in violation of public policy claim.

15     **F.      Punitive Damages**

16         Kautz requests summary adjudication of Roeder's prayer for punitive damages, arguing

17  Roeder has failed to show that Kautz acted with the requisite malice or conscious disregard of the

18  rights and safety of others to sustain punitive damages relief.  *See* Mem. at 27–28.  The court

19  disagrees.

20         "In an action for the breach of an obligation not arising from contract, where it is proven

21  by clear and convincing evidence that the defendant has been guilty of oppression, fraud or

22  malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of

23  example and by way of punishing the defendant."  Cal. Civ. Code § 3294(a).  However, "an

24  employer shall not be liable for [punitive] damages . . . unless the employer had advance

25  knowledge of the unfitness of the employee and employed him or her with a conscious disregard

26  of the rights and safety of others or authorized or ratified the wrongful conduct . . . ." *Id.*

27  § 3294(b).  For corporate employers, the person showing conscious disregard of the rights of

28  others must be an "officer, director, or managing agent." *Id.*  Managing agents are corporate

1  employees who "exercise substantial independent authority and judgment over decisions that

2  ultimately determine corporate policy." *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 573 (1999).

3       Here, Roeder has shown that Steven Kautz, the president of Kautz Vineyards, terminated

4  her employment. *See* Kautz Decl. ¶¶ 1, 9. Kautz is an officer or managing agent under Section

5  3294. There is a dispute of material fact as to why Kautz terminated Roeder, as Roeder may be

6  able to show he terminated her intentionally in spite of protections provided by the

7  FFCRA/EMFLEA. *See* Opp'n at 18–22. Because there remains a dispute as to Kautz's intent in

8  terminating Roeder, the court cannot summarily adjudicate Roeder's prayer for punitive damages.

9  **V.    CONCLUSION**

10      For the foregoing reasons, Kautz's motion for summary judgment (ECF NO. 13) is

11 **granted in part and denied in part.**

12      1) The court **denies** Kautz's motion with respect to Roeder's FFCRA/EFMLEA claim

13          and her termination in violation of public policy claim (Claims One and Six).

14      2) The court **grants** Kautz's motion with respect to Roeder's gender discrimination,

15          hostile work environment and failure to prevent and failure to investigate

16          discrimination claims (Claims Two, Three, Four, and Five).

17      3) The court **denies** Kautz's request for summary adjudication of Roeder's prayer for

18          punitive damages.

19      4) A final pretrial conference is set for **July 10, 2025, at 10:00 a.m** The parties shall

20          meet and confer and file a joint status report **7 days prior** to the final pretrial

21          conference addressing matters the court should consider in setting a trial date,

22          including whether they request referral to a magistrate judge to conduct a further

23          court-convened settlement before the final pretrial conference. *See* E.D. Cal. L.R.

24          282; Fed. R. Civ. P. 16.

25      This order resolves ECF No. 13.

26      **IT IS SO ORDERED.**

27   DATED: June 2, 2025.

_____

SENIOR UNITED STATES DISTRICT JUDGE